UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WAYNE HENSCHEL,

                Plaintiff,                             Case No. 12-11777
                                               Honorable Thomas L. Ludington

v.

CLARE COUNTY ROAD COMMISSION,

                Defendant.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Wayne Henschel was employed by Defendant Clare County Road Commission as a heavy-equipment operator. He also used to be a dues-paying member of Local No. 1855, American Federation of State, County, and Municipal Employees, AFL-CIO, Council #25 (the Union). But in August 2009, he lost his left leg in a motorcycle accident. Defendant believes that without his leg, Plaintiff cannot perform the essential functions of his old job, and his employment was terminated on August 18, 2010. Plaintiff disagrees. So he brought this lawsuit, asserting that Defendant discriminated against him in violation of the Americans With Disabilities Act (ADA). On January 29, 2013, Defendant responded with a motion for summary judgment. Defendant's motion will be granted.

**I**

Defendant hired Plaintiff as a laborer in February 2007. Within a few weeks, Plaintiff applied for and was awarded a position as an excavator operator.[1] The excavator is a large piece of road construction equipment — weighing approximately 20 tons — used to dig ditches and

---

[1] Plaintiff obtained the position by bidding on the position through a job posting. *See* Pl.'s Dep. 26, *attached as* Def.'s Mot. Ex. 1.

trenches during spring, summer, and fall.[2]  Because it can only travel short distances on its own, the excavator is hauled between job sites using a manual-transmission semi-tractor attached to a low-boy trailer.   According to Plaintiff, he was responsible for hauling the excavator to job sites 70% of the time.  Pl.'s Dep. 31, *attached as* Def.'s Mot. Ex. 1.

During the winter months, when not operating the excavator, Plaintiff's job mostly involved plowing snow.  He operated either a grader or a blade truck for the task.  During the entirety of his employment with Defendant, Plaintiff was required to maintain a commercial driver's license (CDL).

In August 2009, Plaintiff was involved in a motorcycle accident.  As a result, his left leg was amputated above the knee.  As established by 49 C.F.R. § 391.41(b)(1), an individual is qualified to drive a commercial motor vehicle only if that person "[h]as no loss of a foot, a leg, a hand, or an arm, or has been granted a skill performance certificate pursuant to 391.49." Accordingly, without his left leg, Plaintiff's CDL was in jeopardy.

But as foreshadowed, pursuant to § 391.49, "A person who is not physically qualified to drive under § 391.41(b)(1) or (b)(2) and who is otherwise qualified to drive a commercial motor vehicle, may drive a commercial motor vehicle, if the Division Administrator, FMCSA, has granted a Skill Performance Evaluation (SPE) Certificate to that person."  § 391.49(a).  Tracking § 391.49, the Michigan Motor Carrier Safety Act provides:

> A person who is not physically qualified to drive under 49 CFR 391.41 and who is otherwise qualified to drive a commercial motor vehicle may drive a commercial motor vehicle if the motor carrier division of the department of state police or the appeal board has granted a waiver to that person.

Mich. Comp. Laws § 480.13(2).  In Michigan, an application for a waiver "shall be submitted jointly by the person who seeks a waiver of his or her physical disqualification and by the motor

---

[2] The excavator is not used during winter months due to Michigan's winter-weather conditions.

carrier that will employ the person if the application is granted."   Mich. Comp. Laws § 480.13(3).

After his accident, Plaintiff was off work until February 2010.   At that time, in accordance with the foregoing provisions, Plaintiff and Defendant jointly filed for a medical waiver concerning Plaintiff's CDL.   After submitting the application, Defendant received a request for additional information from the Traffic Safety Division of the Michigan State Police. The Traffic Safety Division wanted a copy of the August 2009 accident report, and "[a]n evaluation of [Plaintiff's] ability to perform the essential job functions of a truck driver, including driving a manual transmission, while using his prosthetic device."   Def.'s Mot. Ex. 6, at 1.

Defendant's Superintendent, John Krchmar, was assigned to conduct Plaintiff's evaluation.   Together with Managing Director Steve Stocking, Krchmar generated a list of physical tasks performed by Defendant's truck drivers.   On March 22, 2010, Krchmar and Stocking met with Plaintiff and his Union representatives to discuss the need for testing. Plaintiff requested that any evaluation occur that day, so Krchmar proceeded to conduct a four-hour examination of Plaintiff's abilities.   Plaintiff successfully completed every task that was asked of him, but he had difficulty operating the excavator's foot and hand controls simultaneously, and also struggled with the clutch while operating a manual transmission.   A report was generated which noted Plaintiff's difficulties, and he acknowledged the report was accurate.

After the evaluation report and the 2009 accident report were submitted to the Traffic Safety Division, Plaintiff was granted a medical waiver by the Motor Carrier Safety Appeal Board.   The waiver, however, was limited to the operation of automatic-transmission vehicles.

Accordingly, Plaintiff could no longer operate the manual-transmission semi-truck necessary to haul the excavator to various job sites. He also could not operate the manual-transmission blade trucks that were used for plowing snow.[3]

Nevertheless, Defendant attempted to keep Plaintiff at work by transitioning him from the excavator operator to a truck driver position. But a problem arose with Defendant's Union employees. Plaintiff, and his fellow employees who were members of the Union, were governed by a December 11, 2008 collective bargaining agreement with Defendant. Based on the agreement, Union employees are assigned trucks and other equipment based on seniority. *See* Def.'s Mot. Ex. 2, at 15. At the time Defendant was attempting to move Plaintiff to a truck driver position, every automatic truck it owned was already assigned to a Union employee with more seniority than Plaintiff. The only spare trucks all had manual transmissions, which he could not operate. So Defendant held a meeting to determine if any Union employee was willing to give up an automatic truck for Plaintiff. During the meeting, two employees volunteered, but one changed his mind almost immediately.[4]

With one volunteer remaining, Defendant and the Union entered into a Letter of Understanding, dated May 13, 2010, which provided that Plaintiff would resign his position as excavator operator and agreed to be classified as a truck driver. The Letter of Understanding, in its entirety, reads as follows:

> This letter of understanding is for returning Mr. Wayne Henschel to work following an off-the-job injury that resulted in the loss of a limb.
>
> As background information, Mr. Henschel lost his left leg following a motorcycle accident in August 2009. He was fitted with a prosthetic device and subsequently obtained a CDL Medical Waiver to drive a truck provided it has an automatic

---

[3] Although, as will be discussed, Defendant does own automatic-transmission blade trucks as well.
[4] Union President John Smith testified that Nathan Hulliberger and Lloyd Pifer originally volunteered to give up their automatic-transmission trucks for Plaintiff. Smith Dep. 12. According to Smith, Hulliberger changed his mind within the week. *Id.*

transmission (AT).  The Road Commission has trucks with AT's, but they are all currently assigned to drivers.  The labor contract does not allow the road commission to remove a driver from an AT equipped truck in order to accommodate Mr. Henschel.  Therefore, this Letter of Understanding is drafted to outline conditions satisfactory to management and labor for returning Mr. Henschel to work.

By signatures below, the parties to the agreement commencing December 11, 2008 between the Board of County Road Commissioners of Clare County, hereinafter referred to as the Road Commission, and the American Federation of State, County, and Municipal Employees Local #1855, hereinafter referred to as the Union, agree as follows:

1. The Road Commission is not required to follow the normal posting process outlined in the labor agreement for this situation only.
2. Mr. Henschel resigns his current posting of operator which includes equipment.
3. A driver of a truck with an automatic transmission voluntarily agrees to resign the equipment currently assigned to him.
4. Mr. Henschel agrees to be classified as a truck driver and accept the assignment of the previously mentioned truck with an automatic transmission.
5. If there are no volunteers as referred to in paragraph three above the least senior employee assigned a truck with an automatic transmission shall resign the equipment currently assigned to him and such shall be assigned to Mr. Henschel.
6. This agreement shall not be considered to set any precedent as to any future situations, circumstance or individual.
7. This Letter of Understanding shall modify the parties Collective Bargaining Agreement only to the extent as necessary to comply with the specific terms of this Letter of Understanding as stated herein.

This agreement is effective on the latest date of signing below.  This letter of Understanding can be terminated at any time by either the Employer or the Union by providing thirty (30) days written notice to the other party.  The Letter of Understanding shall terminate thirty (30) days after receiving such written notice.

Def.'s Mot. Ex. 13, at 1–2.  With this Agreement in place, Plaintiff was returned to work.

But less than one week later, the second employee changed his mind and also refused to

give up his truck.[5]  Unwilling to force the least-senior employee to do so, the Union notified

---

[5] Lloyd Pifer changed his mind about giving up his truck when he discovered he would not be able to replace Plaintiff as the excavator operator.  Pifer Dep. 31–32.

Defendant that it was terminating the Letter of Understanding.   Union President John Smith

testified concerning the Union's decision to terminate the Letter of Understanding:

> A:   Like I said before, Nate Hulliberger come in and informed me that he was
> not willing to give his truck up.  Lloyd Pifer agreed still to give his truck
> up.  Wayne come back to work, three days later Mr. Pifer refused to give
> his truck up.  That's when I went to Mr. Stocking, and I still think it was
> Henry O'Hare was with me, and we wanted to terminate this because no
> one else would volunteer to give their truck up, and the low seniority guy
> did not want to give his truck up because he was low seniority.
>
> Q:   Do you know why Lloyd changed his mind?
> A:   I'm not even going to guess.  It was his choice.
>
> Q:   You didn't talk to him?
> A:   No, I didn't talk to him.  When I found out about it I went right to Mr.
> Stocking about it and asked to have this terminated.
>
> Q:   When the union terminated this letter of understanding what happened to
> Wayne?
> A:   I believe he was sent home the next day.
>
> Q:   When the union terminated this letter of understanding was there a truck
> for Wayne to use with an automatic transmission?
> A:   No, none that we had.

Smith Dep. 16.

Because he could no longer haul the excavator — and with no automatic-transmission

trucks available — Defendant was forced to send Plaintiff home.  No further requests for

accommodation were made by Plaintiff or the Union.  On August 18, 2010, pursuant to the

Union's collective bargaining agreement, Plaintiff's employment was terminated.  Plaintiff then

filed this lawsuit, and Defendant responded with a motion for summary judgment.

## II

Summary judgment is proper when there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The focus must

be "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence are drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper where a plaintiff fails to produce evidence creating a genuine issue of material fact as to any of the essential elements of its prima facie case. *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (citing *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995)).

## III

Plaintiff argues that Defendant violated the ADA by discriminating against him on account of his disability and by failing to provide him with reasonable accommodations. Upon review, Plaintiff's claims lack merit, and Defendant's motion for summary judgment will be granted.

## A

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Such disabled but "qualified" employees are those "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). An employer violates the ADA when it does not make reasonable accommodations for "the known physical or mental limitations of an otherwise qualified individual," unless it can "demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." § 12112(b)(5)(A).

In *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc), the Sixth Circuit considered the appropriate standard for reviewing ADA cases. The court

concluded that the ADA bars discrimination "because of" an employee's disability, meaning that it prohibits discrimination that is a "'but-for' cause of the employer's adverse decision." *Id*. at 321 (quoting *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 176 (2009)).

Under this standard, a plaintiff can establish a *prima facie* case of discrimination under the ADA through either direct or circumstantial evidence. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). Direct evidence is that which "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the adverse employment action." *Erwin v. Potter*, 79 F. App'x 893, 896 (6th Cir. 2003) (internal quotation marks omitted) (quoting *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996)). Direct evidence may "take the form, for example, of an employer telling an employee, I fired you because you are disabled." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998)).

Here, Plaintiff believes he lost his job because he first lost his leg. Defendant, apparently conceding the point, agrees: "Plaintiff's loss of a leg, in and of itself, prevented Plaintiff from performing the duties of a heavy equipment operator." Def.'s Mot. 12. Thus, Plaintiff offers direct evidence to prove his ADA discrimination claim.[6]

The Sixth Circuit has explained that in cases where the plaintiff presents direct evidence of disability discrimination:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.
> (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability:
> > (a) without accommodation from the employer;
> > (b) with an alleged "essential" job requirement eliminated; or

---

[6] There is additional direct evidence that Plaintiff lost his job "because of" his disability: Ronald Bushong testified that Defendant did not consider Plaintiff for an excavator-operator position after his amputation because he could not perform "simultaneous operation of the controls" without his left leg. Bushong Dep. 58. John Krchmar testified Plaintiff was not returned to the excavator because he "could not operate it safely," and that Plaintiff was told "he couldn't run the excavator because of his injury." Krchmar Dep. 28, 29.

(c) with a proposed reasonable accommodation.
(3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004) (formatting supplied).  *See also Beery v. Associated Hygienic Products, LLC*, 243 F. App'x 129, 133 (6th Cir. 2007) (unpublished table opinion).

**B**

The first consideration is whether Plaintiff is disabled under the ADA.  The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  There is little doubt that the loss of his left leg "substantially limits" Plaintiff's major life activities, and he is properly deemed disabled under the ADA.[7]

To recover, however, Plaintiff must demonstrate that despite his disability, he is otherwise qualified for the position of an excavator operator.  This he cannot do.

Noted previously, the ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C.A. § 12111(8).  An individual who cannot perform the essential functions of a job is not qualified and, in such cases, "the ADA does not come into play.  It is irrelevant that the inability to perform essential functions is due entirely to a physical impairment."  *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (citing *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369 (6th Cir. 1997) (holding that an

---

[7] In addition, neither party disputes that Plaintiff is disabled under the ADA.

employee's carpal tunnel syndrome prevented her from performing her assembly line job, but that she was not disabled under the ADA)).

Defendant alleges that Plaintiff cannot perform two essential functions of being an excavator operator — safely operating the excavator and hauling it to the various worksites where it is used — and concludes he is therefore not a "qualified individual" under the ADA. To address the first point, Plaintiff engaged A. David Brayton, an operating engineer, who opined that he is "confident of [Plaintiff's] ability to safely operate the excavator." Brayton Report 2, *attached as* Pl.'s Resp. Ex. 9.[8] As to the second, Plaintiff does not dispute his inability to haul the excavator — only manual semi tractors are available for the job, and Plaintiff is not authorized to drive one. Instead, Plaintiff argues that transporting the excavator is not an essential job function of being an excavator operator.

Putting aside Plaintiff's ability to safely operate the excavator, if hauling it to the jobsite is an essential job function of an excavator operator, then Plaintiff's ADA claim is without merit — he cannot perform the essential functions of the job and is therefore not "otherwise qualified." To guide the determination of whether particular job functions are essential, the ADA establishes that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C.A. § 12111(8). In essence, a job function is essential "if its removal would 'fundamentally alter' the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (citation omitted). A job function may be considered essential for several reasons, including the following:

---

[8] Defendant filed a motion to exclude Mr. Brayton's testimony, but that motion need not be addressed in this Opinion & Order, as Defendant's motion for summary judgment will be granted on other grounds.

(i)     The function may be essential because the reason the position exists is to perform that function;

(ii)    The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii)   The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).  The Sixth Circuit has established that the determination of whether a job function is essential should be based on "more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988).  Factors to consider when determining whether a job function is essential include:

> (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs.

*Keith v. County of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013) (citing 29 C.F.R. § 1630.2(n)(3)).

Upon review, the Court concludes that transporting the excavator is an essential function of Defendant's excavator-operator position.[9]

Recent circumstances have altered Defendant's operations.  While previously there were two individual semi-truck drivers responsible for transporting various equipment, now there is only one.  Bushong Dep. 43; Pifer Dep. 27.  This is because Defendant "got low on people.

---

[9] The Court recognizes that "the determination of whether a given function is 'essential' within the meaning of the ADA and regulations promulgated thereunder is typically a question of fact and thus not suitable for resolution through a motion for judgment as a matter of law." *Brickers v. Cleveland Bd. Of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998) (citing *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988)).  But the determination of "essentialness" in this case, as it was in *Brickers*, "is properly a question of law." 145 F.3d at 849; *see also Olds v. United Parcel Serv., Inc.*, 127 F. App'x 779, 783 (6th Cir. 2005) (remanding case where "district court will need to determine what the 'essential functions' of UPS jobs are and whether Olds reasonably can perform them.").

Everybody had to pull their part.  Or do their part, I should say."  *Id.*  As a result, instead of semi-truck drivers transporting the excavator between worksites, the excavator operators are expected to do it themselves.  Plaintiff testified that during his time working as an excavator operator, he was responsible for picking up the excavator in a semi-truck and transporting it to the worksite "70 percent of the time."  Pl.'s Dep. 31.  Robert Fisch, the one semi-truck driver in 2010, testified he moved the excavator only "Periodically."  Fisch Dep. 10, *attached as* Pl.'s Resp. Ex. 6.  Because of the changes the task of transporting the excavator between worksites is an "essential function" of the excavator-operator position.  *See* 29 C.F.R. § 1630.2(n)(2)(ii).

Plaintiff argues hauling the excavator is not an essential function of the excavator-operator position because the task is not listed in the position's job duties, but rather is the listed responsibility of truck drivers.  But as the Sixth Circuit noted in *Hall*, determining whether a specific task is an essential function of a job should be based not on written job descriptions, but the "actual functioning and circumstances" involved with the position.  *Hall*, 857 F.2d at 1079.  Defendant now requires excavator operators to transport the excavator at least seven times in ten, while semi-truck drivers perform the task only "periodically."  Defendant's belief that transporting the excavator is an essential function of the excavator-operator position, along with the consequences of forcing other individuals to do the task if Plaintiff cannot, favors finding that hauling the excavator is an essential function of excavator operators.  *See Keith*, 703 F.3d at 925–26.

It is true that Defendant's description of excavator-operator duties does not include transporting equipment.  *See* Def.'s Mot. Ex. 16, at 1.  Equally true, however, the excavator-operator job description lists "Other duties as assigned."  *Id*. at 2.  According to Ron Bushong, Defendant's Managing Director, an employee's duties could involve "anything from any of the

other [job] categories." Bushong Dep. 27. So while the excavator-operator position does not expressly identify hauling equipment as a general duty, operators are expected to perform any of the truck/tractor driver position duties, which do include "Hauling several different types of equipment." Def.'s Mot. Ex. 16, at 1.

Removing the task of hauling the excavator would fundamentally alter the excavator-operator position, as well as Defendant's one salaried semi-truck driver position. Instead of excavator operators transporting the excavator a majority of the time, while the semi-truck driver is free to accomplish other tasks, that driver would be forced to move the excavator whenever it needs to travel. *See Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999) ("Courts have continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.").

Given Defendant's belief that transporting the excavator is an excavator operator's essential function, the fundamental change that would result if the task were redirected to semi-truck drivers, and the lack of others to shoulder the responsibility, it is apparent that transporting the excavator is an essential function of Defendant's excavator operators. Because Plaintiff cannot perform the task, he is not otherwise qualified for the position. Plaintiff's argument that he can perform the job if only truck drivers were responsible for hauling the excavator is without merit, because "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland County Sherriff's Dept.*, 227 F.3d 719, 729 (6th Cir. 2000) (citing *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999)).

**C**

Plaintiff also argues that reasonable accommodations would have permitted him to return to work.[10]  Specifically, Plaintiff believes that "[a]s to the blade truck position, [t]he only thing preventing Plaintiff from working as a truck driver was the availability of an automatic."  Pl.'s Resp. 24.  Plaintiff suggests that because he was briefly returned to the position of truck driver, Defendant cannot argue that he was not otherwise qualified for the position, only that he could not be accommodated.  *Id.* at 22.

In other words, Plaintiff believes that it would have been a reasonable accommodation for Defendant to transfer him from his excavator-operator position to a truck-driver position, where he could operate an automatic-transmission truck.  But as before, Plaintiff's argument misses the mark.

Under the ADA, "an employer need only reassign the employee to a vacant position." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) (collecting cases).  Generally, transfer or reassignment "is only considered when accommodation within the individual's current position would pose an undue hardship."  *Id.* (citing *Pattison v. Meijer, Inc.*, 897 F. Supp. 1002, 1007–08 (W.D. Mich. 1995)).  Regardless of anything else, "a reassignment will not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement."  *Cassidy*, 138 F.3d at 634; *see also Lujan v. Pacific Maritime Ass'n*, 165 F.3d 738, 742 (9th Cir. 1999) (collecting cases).

---

[10] Plaintiff first claims that requiring truck drivers to haul the excavator would be a reasonable accommodation even if the task is an essential function of the excavator-operator position. Pl.'s Resp. 24. Finding that hauling the excavator is an excavator-operator's essential function, and noting that Defendant is not required to shift essential functions in order to accommodate a plaintiff, *see Hoskins*, 227 F.3d at 729, this argument will not be addressed in greater detail. *See also Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir. 1996) (having a helper perform "most if not all" of roof bolter tasks were "extraordinary," not reasonable accommodations); *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991) (employee's requested accommodation of having co-workers perform essential lifting tasks of job is not "reasonable").

- 14 -

So while Plaintiff potentially could have performed the duties of a truck driver, so long as he had access to an automatic-transmission truck, the simple fact is no such truck was available. The only way an automatic truck could have been made available, when Plaintiff's fellow Union employees were unwilling to give theirs up, would have been forcing a Union employee to move to a manual-transmission truck, which apparently, the Union was unwilling to do.  Although such action would have been to Plaintiff's benefit, and he could be working for Defendant to this day, the ADA does not require Defendant to violate a collective bargaining agreement to accomplish the task.

Plaintiff cannot perform the essential functions of his excavator-operator job, and the accommodation he suggests — that he be given an automatic-transmission truck to the detriment of another employee — is unreasonable.  Accordingly, his ADA claims must fail.[11]

**D**

Plaintiff raises a few other issues that require attention.  First, Plaintiff argues that Defendant did not make an "individualized inquiry" to determine whether he could perform his position as an excavator operator.  To support this position, Plaintiff notes that "Defendant tested the Plaintiff.  By Defendant's own admission, Plaintiff passed the test.  Yet, Defendant concluded Plaintiff could not do the job."  Pl.'s Resp. 18.  That is not quite accurate.

In fact, it was Michigan's Traffic Safety Division that requested Plaintiff be tested in the first place, not Defendant.  After his evaluation report was sent to the Traffic Safety Division, it was the Motor Carrier Safety Appeal Board, not Defendant, that decided Plaintiff could not

---

[11] Although not the basis of this Opinion & Order, there are other grounds to dismiss Plaintiff's claims.  In July 2012, Plaintiff's own treating physician opined that Plaintiff's "impairments have caused permanent disability. He will not be able to return to any kind of employment and needs to go on long-term disability."  Def.'s Mot. Sanctions Ex. 13, at 3.  Where a plaintiff's "own doctor," not the defendant, "has concluded she could not perform her job . . . [that plaintiff] cannot establish that she is a 'qualified individual with a disability' under the ADA." *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (quoting *Weigel v. Target Stores*, 122 F.3d 461, 467 (7th Cir. 1997)).

safely operate manual-transmission vehicles. Finally, it was the Union that determined there were no automatic-transmission trucks available for Plaintiff's use and terminated the Letter of Understanding, not Defendant. Plaintiff's argument that he passed Defendant's test and therefore should have been returned to work is disingenuous at best — for it was not Defendant that placed obstacles in his path, but Michigan's Traffic Safety Division and Plaintiff's own Union.

Plaintiff also claims Defendant did not engage in the "interactive process" in order to get him back to work. The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc)). Even though the interactive process is not described in ADA's statutory text, "the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871 (collecting cases). When a party obstructs the process or otherwise fails to participate in good faith, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.* (quoting *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

Of course, generally, an ADA plaintiff "bears the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable." *Kleiber*, 485

F.3d at 870 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)).  In this case, Plaintiff has only suggested accommodations that are not required under the ADA (transferring essential functions of the job to others or placing him in a position that would infringe upon other employee's rights).

Further, any argument that Defendant did not attempt to identify reasonable accommodations with "good faith" is without merit.  When Plaintiff was originally injured and lost his CDL, it was Defendant who "took care of" applying for Plaintiff's medical waiver.  Pl.'s Dep. 43–44.  When Plaintiff was unable to perform the essential functions of the excavator-operator position, it was Defendant who suggested he be placed in an automatic-transmission truck and reassigned as a truck driver.  Pl.'s Resp. 25.  Of course, when no trucks were available, and neither Plaintiff nor his Union representatives suggested other possible accommodations, there was little Defendant could do but terminate his employment.  Not out of bad faith, but simple necessity.

## IV

One issue remains: Defendant's motion for discovery sanctions.  According to Defendant, Plaintiff "has engaged in bad faith and a deliberate course of conduct calculated to completely obstruct the discovery process."  Def.'s Mot. Sanctions 2, ECF No. 37.  As a remedy, Defendant requests "additional discovery time concerning Plaintiff's physical condition," and the "opportunity to further depose Plaintiff and his economic expert with regard to the information untimely provided after the close of discovery, at Plaintiff's cost."  *Id*. at 2–3.  Of course, these solutions are rendered unnecessary when Defendant is granted summary judgment, and therefore, Defendant's motion for sanctions will be denied.[12]

---

[12] The Court understands it has authority to impose monetary sanctions as well, but emphasizes that Federal Rule of Civil Procedure 37 sanctions are "within the sound discretion of the Court based on the facts of each

- 17 -

**V**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 28, is **GRANTED**.

It is further **ORDERED** that Defendant's motion to disqualify Plaintiff's expert, ECF No. 27, is **DENIED** as moot.

It is further **ORDERED** that Defendant's motion for sanctions, ECF No. 37, is **DENIED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED** with prejudice. This is a final order and closes the case.

Dated: April 16, 2013                                          s/Thomas L. Ludington
                                                               THOMAS L. LUDINGTON
                                                               United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 16, 2013.

                            s/Tracy A. Jacobs
                            TRACY A. JACOBS

---

particular case." *Freeman v. Troutt*, No. 3:10-0697, 2011 WL 4343806, at *2 (M.D. Tenn. Sept. 14, 2011) *report and recommendation adopted*, No. 3:10-0697, 2011 WL 5981653 (M.D. Tenn. Nov. 29, 2011); *see also Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 642 (1976) (per curiam). The facts of this case do not warrant monetary sanctions based on Plaintiff's failure to provide medical information, especially in light of the fact that Defendant was authorized by Plaintiff to access the information on its own. *See* Pl.'s Resp. 27–28.