UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WAYNE HENSCHEL,

                    Plaintiff,                                    Case No. 12-cv-11777

v.                                                               Honorable Thomas L. Ludington

CLARE COUNTY ROAD COMMISSION,

                    Defendant.

_____/

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This case returns from the Sixth Circuit for reconsideration of Defendant Clare County Road Commission's January 29, 2013 Motion for Summary Judgment. This Court granted that motion on April 26, 2013 and entered Judgment against Plaintiff Wayne Henschel. The opinion granting Defendant's motion concluded that Henschel could not perform an essential function of his prior job as the operator of a construction excavator because he could not drive the automatic transmission semi-trucks that operator's often use to transport excavators between job sites. The Sixth Circuit disagreed that moving the excavator is an essential function of an operator's job. *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1024 (6th Cir. 2013), *reh'g denied* (Feb. 10, 2014). It returned the case for consideration of Defendant's motion for summary judgment in light of its analysis of the excavator operator's job functions.

After the Sixth Circuit returned the mandate in this case, the parties were directed to submit supplemental briefing concerning the Sixth Circuit's opinion. The parties timely submitted their briefing on the issues remaining following remand. *See* Def.'s Supp. Br., ECF

No. 54; Pl.'s Supp. Resp. Br., ECF No. 55; Def.'s Supp. Reply Br., ECF No. 56. The matter is now ripe for adjudication.

## I.

### A.

Defendant hired Plaintiff as a laborer in February 2007. Within a few weeks, Plaintiff applied for and was awarded a position as an excavator operator.[1] The excavator is a large piece of road construction equipment—weighing approximately 20 tons—used to dig ditches and trenches during spring, summer, and fall.[2] Because it can only travel short distances on its own, the excavator is hauled between job sites using a manual-transmission semi-tractor attached to a low-boy trailer.  According to Plaintiff, he was responsible for hauling the excavator to job sites 70% of the time the excavator needed to be hauled. *See* Henschel Dep. 31, Ex. 1, Def.'s Mot. Summ. J., ECF No. 28-2.

During the winter months, when not operating the excavator, Plaintiff's job mostly involved plowing snow. He operated either a grader or a blade truck for the task. During the entirety of his employment with Defendant, Plaintiff was required to maintain a commercial driver's license (CDL).

In August 2009, Plaintiff was involved in a motorcycle accident. As a result, his left leg was amputated above the knee. As established by 49 C.F.R. § 391.41(b)(1), an individual is qualified to drive a commercial motor vehicle only if that person "[h]as no loss of a foot, a leg, a hand, or an arm, or has been granted a skill performance certificate pursuant to 391.49." Accordingly, without his left leg, Plaintiff's CDL was in jeopardy.

---

[1]   Plaintiff obtained the position by bidding on the position through a job posting. *See* Henschel Dep. 26, Ex. 1, Def.'s Mot. Summ. J., ECF No. 28-2.

[2]   The excavator is not used during winter months due to Michigan's winter-weather conditions.

Pursuant to § 391.49, "A person who is not physically qualified to drive under § 391.41(b)(1) or (b)(2) and who is otherwise qualified to drive a commercial motor vehicle, may drive a commercial motor vehicle, if the Division Administrator, FMCSA, has granted a Skill Performance Evaluation (SPE) Certificate to that person." § 391.49(a). Tracking § 391.49, the Michigan Motor Carrier Safety Act provides:

> A person who is not physically qualified to drive under 49 CFR 391.41 and who is otherwise qualified to drive a commercial motor vehicle may drive a commercial motor vehicle if the motor carrier division of the department of state police or the appeal board has granted a waiver to that person.

Mich. Comp. Laws § 480.13(2). In Michigan, an application for a waiver "shall be submitted jointly by the person who seeks a waiver of his or her physical disqualification and by the motor carrier that will employ the person if the application is granted." Mich. Comp. Laws § 480.13(3).

After his accident, Plaintiff was off work until February 2010. At that time, in accordance with the foregoing provisions, Plaintiff and Defendant jointly filed for a medical waiver concerning Plaintiff's CDL. After submitting the application, Defendant received a request for additional information from the Traffic Safety Division of the Michigan State Police. The Traffic Safety Division wanted a copy of the August 2009 accident report, and "[a]n evaluation of [Plaintiff's] ability to perform the essential job functions of a truck driver, including driving a manual transmission, while using his prosthetic device." Request, Ex. 6, Def.'s Mot. Summ. J., ECF No. 28-4.

Defendant's Superintendent, John Krchmar, was assigned to conduct Plaintiff's evaluation. Together with Managing Director Steve Stocking, Krchmar generated a list of physical tasks performed by Defendant's truck drivers. On March 22, 2010, Krchmar and Stocking met with Plaintiff and his Union representatives to discuss the need for testing. Plaintiff requested that any evaluation occur that day, so Krchmar proceeded to conduct a four-hour

examination of Plaintiff's abilities. Plaintiff successfully completed every task that was asked of him, but he had difficulty operating the excavator's foot and hand controls simultaneously, and also struggled with the clutch while operating a manual transmission. A report was generated which noted Plaintiff's difficulties, and he acknowledged the report was accurate.

After the evaluation report and the 2009 accident report were submitted to the Traffic Safety Division, Plaintiff was granted a medical waiver by the Motor Carrier Safety Appeal Board. The waiver, however, was limited to the operation of automatic-transmission vehicles. Accordingly, Plaintiff could no longer operate the manual-transmission semi-truck necessary to haul the excavator to various job sites. He also could not operate the manual-transmission blade trucks that were used for plowing snow.[3]

Nevertheless, Defendant attempted to keep Plaintiff at work by transitioning him from the excavator operator to a truck driver position. But a problem arose with Defendant's Union employees. Plaintiff, and his fellow employees who were members of the Union, were governed by a December 11, 2008 collective bargaining agreement with Defendant. Based on the agreement, Union employees are assigned trucks and other equipment based on seniority. *See* Collective Bargaining Agreement 15, Ex. 2, Def.'s Mot. Summ. J., ECF No. 28-2. At the time Defendant was attempting to move Plaintiff to a truck driver position, every automatic truck it owned was already assigned to a Union employee with more seniority than Plaintiff. The only spare trucks all had manual transmissions, which he could not operate. So Defendant held a meeting to determine if any Union employee was willing to give up an automatic truck for

---

[3]   Although, as will be discussed, Defendant does own automatic-transmission blade trucks as well.

Plaintiff. During the meeting, two employees volunteered, but one changed his mind almost immediately.[4]

With one volunteer remaining, Defendant and the Union entered into a Letter of Understanding, dated May 13, 2010, which provided that Plaintiff would resign his position as excavator operator and agreed to be classified as a truck driver. The Letter of Understanding, in its entirety, reads as follows:

> This letter of understanding is for returning Mr. Wayne Henschel to work following an off-the-job injury that resulted in the loss of a limb.
>
> As background information, Mr. Henschel lost his left leg following a motorcycle accident in August 2009. He was fitted with a prosthetic device and subsequently obtained a CDL Medical Waiver to drive a truck provided it has an automatic transmission (AT). The Road Commission has trucks with AT's, but they are all currently assigned to drivers. The labor contract does not allow the road commission to remove a driver from an AT equipped truck in order to accommodate Mr. Henschel. Therefore, this Letter of Understanding is drafted to outline conditions satisfactory to management and labor for returning Mr. Henschel to work.
>
> By signatures below, the parties to the agreement commencing December 11, 2008 between the Board of County Road Commissioners of Clare County, hereinafter referred to as the Road Commission, and the American Federation of State, County, and Municipal Employees Local #1855, hereinafter referred to as the Union, agree as follows:
>
> 1. The Road Commission is not required to follow the normal posting process outlined in the labor agreement for this situation only.
> 2. Mr. Henschel resigns his current posting of operator which includes equipment.
> 3. A driver of a truck with an automatic transmission voluntarily agrees to resign the equipment currently assigned to him.
> 4. Mr. Henschel agrees to be classified as a truck driver and accept the assignment of the previously mentioned truck with an automatic transmission.

---

[4] Union President John Smith testified that Nathan Hulliberger and Lloyd Pifer originally volunteered to give up their automatic-transmission trucks for Plaintiff. *See* Smith Dep. 12, Ex. 6, Def.'s Supp. Br., ECF No. 54-2. According to Smith, Hulliberger changed his mind within the week. *Id.*

5. If there are no volunteers as referred to in paragraph three above the least senior employee assigned a truck with an automatic transmission shall resign the equipment currently assigned to him and such shall be assigned to Mr. Henschel.

6. This agreement shall not be considered to set any precedent as to any future situations, circumstance or individual.

7. This Letter of Understanding shall modify the parties Collective Bargaining Agreement only to the extent as necessary to comply with the specific terms of this Letter of Understanding as stated herein.

This agreement is effective on the latest date of signing below. This letter of Understanding can be terminated at any time by either the Employer or the Union by providing thirty (30) days written notice to the other party. The Letter of Understanding shall terminate thirty (30) days after receiving such written notice.

Letter of Understanding 1-2, Ex. 13, Def.'s Mot. Summ. J., ECF No. 28-4. With this Agreement

in place, Plaintiff was returned to work.

But less than one week later, the second employee changed his mind and also refused to

give up his truck.[5] Unwilling to force the least-senior employee to do so, the Union notified

Defendant that it was terminating the Letter of Understanding. Union President John Smith

testified concerning the Union's decision to terminate the Letter of Understanding:

A: Like I said before, Nate Hulliberger come in and informed me that he was not willing to give his truck up. Lloyd Pifer agreed still to give his truck up. Wayne come back to work, three days later Mr. Pifer refused to give his truck up. That's when I went to Mr. Stocking, and I still think it was Henry O'Hare was with me, and we wanted to terminate this because no one else would volunteer to give their truck up, and the low seniority guy did not want to give his truck up because he was low seniority.

Q: Do you know why Lloyd changed his mind?
A: I'm not even going to guess. It was his choice.

Q: You didn't talk to him?
A: No, I didn't talk to him. When I found out about it I went right to Mr. Stocking about it and asked to have this terminated.

---

[5] Lloyd Pifer changed his mind about giving up his truck when he discovered he would not be able to replace Plaintiff as the excavator operator. *See* Pifer Dep. 31-32, Ex. 5, Pl.'s Resp. Br. to Def.'s Mot. Summ. J., ECF No. 32-6.

> Q:   When the union terminated this letter of understanding what happened to Wayne?
>
> A:   I believe he was sent home the next day.
>
> Q:   When the union terminated this letter of understanding was there a truck for Wayne to use with an automatic transmission?
>
> A:   No, none that we had.

Smith Dep. 16, Ex. 6, Def.'s Supp. Br., ECF No. 54-2..

Because he could no longer haul the excavator—and with no automatic-transmission trucks available—Defendant sent Plaintiff home. No further requests for accommodation were made by Plaintiff or the Union. On August 18, 2010, pursuant to the Union's collective bargaining agreement, Plaintiff's employment was terminated. Plaintiff then filed this lawsuit, and Defendant responded with a motion for summary judgment.

This Court granted Defendant's motion. The Opinion and Order concluded that because Plaintiff was tasked with hauling the excavator 70% of the time that the excavator was in transit, hauling the excavator was an essential function of the excavator operator's job. Since Plaintiff could not haul the excavator because he could not operate an automatic transmission truck, he could not perform an essential function of his job and summary judgment was appropriate. Judgment was entered against Plaintiff on April 16, 2013 and Plaintiff timely appealed.

**B.**

The Sixth Circuit reversed. In doing so, the Sixth Circuit crafted two new bright-line rules applicable at the summary judgment stage in ADA cases. By applying these two new rules, the Sixth Circuit rejected Plaintiff's employer's assessment and concluded that hauling the excavator from job site to job site is not an essential function of an excavator operator's job.

First, the Sixth Circuit held that a job function that occupies less than 7 percent of an employee's time cannot, as a matter of law, be essential:

> The district court determined that hauling the excavator took a substantial amount of the excavator operator's time, relying on Henschel's testimony that he hauled it 70 percent of the time. That evidence, however, only addresses the distribution of the work, not the amount of time actually spent transporting the excavator. The excavator is not moved every day and is sometimes operated at the same work site for weeks at a time. Henschel testified that 90 percent of the time, the excavator stayed at the job site. The record does not address how much time Henschel actually spent hauling the excavator to different work sites, but this obviously varies depending on the number and location of work sites. Viewed in the light most favorable to Henschel, there is sufficient evidence that hauling the excavator did not take much of the excavator operator's time and was a relatively marginal function.

*Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1023 (6th Cir. 2013), reh'g denied (Feb. 10, 2014). As the Sixth Circuit highlighted, the record reflects that the excavator remained at the job site 90 percent of the time. That means that 10 percent of the time it was in transit. If Henschel moved the excavator 70 percent of the time, he spent 7 percent of his time on the job moving the excavator. *See* April 16, 2013 Op. & Order 12, ECF No. 41 ("Defendant now requires excavator operators to transport the excavator at least seven times in ten, while semi-truck drivers perform the task only 'periodically.'"). The Sixth Circuit rejected the employer's assessment, reaching the conclusion that this "did not take much of [his] time and [i]s a relatively marginal function." *Id*.

However, if all four excavator operators transported their own excavators 70 percent of the time, then 28 out of 40 times an excavator needs to be moved, it must be done by an excavator operator. The other 12 times, it is done by a semi-truck driver. But the Sixth Circuit held that "even with only one regular semi-truck driver there would be minimal consequences to [Defendant]'s operations if the excavator operator no longer hauled the excavator." *Henschel*, 737 F.3d at 1023. Specifically, the Sixth Circuit emphasized the testimony of Lee Schunk, a former employee of Defendant, who testified that "the semi-truck driver could have hauled the excavator for Henschel without a problem and that there were a number of CCRC employees

- 8 -

other than the semi-truck driver who could do so when needed." *Id.* at 1023-24. It reached this conclusion notwithstanding the fact that "[c]ourts have continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability." *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999).

Second, the Sixth Circuit concluded that if a task is listed in another employee's job description, it cannot, as a matter of law, be an essential function of the plaintiff's job: "CCRC's written job descriptions provide evidence that hauling the excavator was the Truck/Tractor Driver's job duty and not one of the excavator operator's essential functions." *Henschel*, 737 F.3d at 1024. This rule parallels the Sixth Circuit's previously articulated rule that a determination about whether a task is essential "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988). How these two rules coexist was not explained.

The Sixth Circuit vacated the April 16, 2013 Judgment and remanded for further proceedings.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence

"which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must draw all reasonable inferences in favor of the non-movant when reviewing the evidence and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.

On remand from the Sixth Circuit all that remains are questions of fact. The primary dispute between the parties is whether there is a genuine dispute of material fact with respect to two issues: (1) can Henschel safely operate an excavator in his current physical condition; and, if he can safely operate an excavator, (2) is "assigning Henschel to an automatic transmission blade truck or grader to plow snow during the winter as part of the excavator operator position would have been a reasonable accommodation"? *Henschel*, 737 F.3d at 1025. If a genuine dispute of material fact exists as to either of those questions, the case should be decided by a jury.

### A.

The initial dispute to be resolved is Henschel's ability to operate the excavator safely. The parties agree that there is no reasonable accommodation to be had when it comes to working

the excavator. Henschel either can, or cannot operate it safely. For their part, the Sixth Circuit

suggests the question is jury submissible, writing:

> The record appears to reflect a dispute of fact on this issue. CCRC submitted evidence that Krchmar, Bushong, and John Smith—the local AFSCME Union head at the time of Henschel's attempted return—did not believe that Henschel could operate the excavator safely. Henschel submitted evidence that Schunk, a former CCRC excavator operator; Pifer, a CCRC employee who has operated the excavator at times; and A. David Brayton, a former Michigan Occupational Safety and Health Administration Construction Safety Inspector, all believed that Henschel could operate the excavator safely.

*Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1024 (6th Cir. 2013), *reh'g denied* (Feb. 10,

2014). While ostensibly reaching factual conclusions based on the contours of the record as it

was before them, the Sixth Circuit explained that it actually "decline[s] to rule here and

remand[s] to the district court to determine in the first instance if a genuine issue of material fact

exists as to whether Henschel is qualified to operate the excavator." *Henschel v. Clare Cty. Rd.*

*Comm'n*, 737 F.3d 1017, 1024 (6th Cir. 2013), *reh'g denied* (Feb. 10, 2014). As a result, the

Sixth Circuit's opinion regarding the state of the facts concerning Henschel's ability to safely

operate the excavator must be regarded as guidance only. Accordingly, the evidence must be

reviewed anew.

As the Sixth Circuit noted, testimony has been collected in support of each party's

position. Defendant has provided the deposition testimony of three individuals—John Krchmar,

Ronald Bushong, and John Smith—who all believe that Henschel cannot safely operate the

excavator. Likewise, Henschel has provided the deposition testimony of three individuals—Lee

Schunk, Lloyd Pifer, and A. David Brayton—who believe that, to the contrary, he can safely

operate the excavator. The content of these opinions vary markedly, however.

The witnesses that do not believe Henschel is capable of operating the excavator safely

are John Krchmar, Defendant's Superintendent, Ronald Bushong, Defendant's Managing

- 11 -

Director, and John Smith, the local union president. The witnesses that do believe Henschel is capable of operating the excavator safely are Lee Schunk, a former CCRC excavator operator, Lloyd Pifer, a CCRC employee with some limited experience operating an excavator, A. David Brayton, a former Construction Safety Inspector for the Michigan Occupational Safety and Health Administration, and, of course, Henschel.

The quantitative alignment of these opinions, which the Sixth Circuit found compelling, is not reflective of their qualitative alignment. Indeed, five of the seven individuals, including Henschel, agree that he cannot operate the foot controls on the excavator. Another individual rendered no opinion on whether Henschel could operate the excavator pedals, only stating conclusorily that Henschel could safely operate the machine. The final witness opined that Henschel could operate the excavator safely but had never operated such a machine.

John Krchmar, Defendant's Superintendent and the excavator operator supervisor, testified that he does not believe Henschel can operate the excavator safely. *See* Dep. of John Krchmar 28, Def.'s Supp. Br., Ex. 1, ECF No. 54-1. He was asked if an "excavator can be controlled or ran simply by using your hands with the hand controls." *Id*. at 29. Krchmar answered no. When asked why he answered no he conceded that there are hand controls that perform the same functions as the foot controls on an excavator meaning that using the hand controls makes the foot controls redundant. *Id*. at 30. Despite this, however, Krchmar noted that it is still not possible to operate the excavator without using your feet because "[y]ou can't operate the hand controls if your hands are on the levers so you're not operating the machine." *Id*. at 31. The levers to which Krchmar refers are the non-redundant hand controls that operate functions different from those operated by the redundant foot and hand controls.

- 12 -

This testimony was echoed by Ronald Bushong, CCRC's Managing Director, who stated that in his opinion "you need to use both hands and both feet simultaneously" while operating the excavator. Dep. of Ronald Bushong 51, Ex. 4, Def.'s Supp. Br., ECF No. 54-2. While he conceded that hands and feet are not needed all of the time, someone operating an excavator "can't perform travel and hydraulic operation at the same time only with your hands." *Id*. at 51-52. He illustrated the need to use both hands and feet at the same time by explaining the difficulties of not being able to coordinate movements of the excavator:

> If you cannot use the controls, the hydraulic controls, to take the weight off the ground, take the tracks off the ground, when you turn using just hand levers you are skidding the machine on the ground. Whether you're damaging a yard or damaging the blacktop it's in my opinion necessary to use the hydraulic controls as well to take the weight of the machine off the ground and run the tracks at the same time as you're using the swing and down pressure operations from the hydraulic control to minimize damage to the roadway, damage to private property and damage to the equipment.

*Id*. at 55-56. He concluded that to effectively operate the excavator as an employee of Defendant it is necessary to use both hands and both feet simultaneously. *Id*. at 56.

In addition, John Smith, the local union president, testified that from his own experience "running the equipment . . . you have to use all the controls at one time or another." Dep. of John Smith 50, Ex. 6, Def.'s Supp. Br., ECF No. 54-2. This led Smith to state that he does not "believe that [Henschel] could have run [his excavator] properly." *Id*. at 49. According to Smith, he "talked to Wayne [Henschel] about it." *Id*. at 50. That is, he discussed his opinion with Henschel but when Henschel told Smith that he could properly operate the excavator, Smith dropped it.

But, during his deposition, Henschel himself concurred with the assessment of Krchmar, Bushong, and Smith when he agreed that, concerning the foot pedals, he does not "touch them with [his] feet." *See* Dep. of Wayne Henschel 74, Ex. 3, Def.'s Supp. Br., ECF No. 54-1. He

further explained: "If I'm going to have difficulties with using my feet when I can use my hands I just use my hands instead of my feet." *Id*. Henschel concluded that because he had difficulty operating the foot pedals on the excavator he "didn't use them at all." *Id*.

Lee Schunk, a former excavator operator, reached a similar conclusion to Henschel. He felt that Henschel could operate the excavator, even with a prosthetic leg. *See* Dep. of Lee Schunk 11, Ex. 1, Pl.'s Supp. Br., ECF No. 55-2. But Schunk, like the five witnesses above, recognized that there are circumstances where the operator of an excavator could move the excavator in a manner that requires using the foot controls because the operator would need to operate the boom and the tracks at once. *Id*. at 12. Schunk, however, stated that he has "never seen" a situation where an operator would "want to have that much going on all at once." *Id*.

Lloyd Pifer, another employee of Defendant, also testified in support of Henschel's ability to operate the excavator. See Dep. of Lloyd Pifer 29, Ex. 2, Pl.'s Supp. Br., ECF No. 55-3. Pifer did not explain how Henschel could operate the excavator, or what specifically about the excavator would allow Henschel to operate it under all circumstances without ever using the foot controls. Pifer only simply responded in the affirmative when asked if Henschel could operate the excavator with a prosthetic leg. *Id*. at 29. When asked if he had ever seen Henschel operate the excavator after the accident he conceded that no, he had not. *See* Dep. of Lloyd Pifer 56, Ex. 2, Def.'s Supp. Reply, ECF No. 56-1. Pifer also conceded that he does not "have a lot of experience" operating excavators. *Id*. at 58.

Lastly, A. David Brayton, a former Construction Safety Inspector for the Michigan Occupational Safety and Health Administration, offered an opinion as to Henschel's ability to operate an excavator. Brayton testified in deposition that he operated excavators in the fifties, sixties, and seventies while working as an operator for his father, who was a contractor. *See* Dep.

- 14 -

of A. David Brayton 17-19, Ex. 3, Def.'s Supp. Reply, ECF No. 56-1. He admitted, though, that those excavators differed markedly from the machine Henschel would be tasked with operating. *Id*. Further, he has never operated the type of excavator Henschel would be tasked with operating, nor has he trained anyone on its operation. *Id*. He also has never seen Henschel operate one. *Id*. His opinion as to Henschel's ability is based on the fact that he has "been around them and [he has] looked over that manual, and that manual's set up ideal for a man of his handicaps to operate a machine; the foot controls are dual and they have hand controls, too." *Id*.

All witnesses that have experience operating an excavator of the type Henschel would operate agree that he cannot work the foot controls. Thus, the important question left to be answered is whether it is necessary to use the foot pedals to operate the excavator. If so, there can be no reasonable dispute of fact that Henschel cannot safely operate the excavator. At least four witnesses do not believe it is necessary to use the foot pedals to operate the excavator. But one of those witnesses, Lee Schunk, admitted that moving the tracks of the excavator and the arm at the same time would require using one's feet. Another, A. David Brayton, conceded he had never operated an excavator of the type Henschel would operate. Yet another, Lloyd Pifer, stated that he did not have much experience working the excavator; less than 100 hours.

By contrast, the excavator supervisor, John Krchmar, who had operated an excavator himself, felt Henschel could not safely operate the machine. Despite the fact that Krchmar has operated an excavator himself, there is no evidence as to the extent of Krchmar's experience with operating the excavator. Ronald Bushong also felt using the foot pedals is necessary and that serious damage can result to the surface under the excavator if they are not used. The hand controls that operate the excavator's arm must be utilized to transfer the excavator's weight while turning in some circumstances so that the excavator does not destroy the ground beneath it,

be it a newly paved roadway or a plot of unpaved land. John Smith also agreed that at one time or another, an operator would need to use the foot and hand controls simultaneously. As with Krchmar, however, there is no evidence in the record as to the extent of Bushong and Smith's familiarity with operating an excavator of the type Henschel would be operating.

Further, there is non-testimonial evidence that using the hand and foot controls simultaneously is necessary. The Operation and Maintenance Manual issued by Caterpillar for the 320C Excavator describes operational movements of the machine that require using the arm-control levers while the machine is in motion. Specifically, it includes the following three travel instructions that include operation of the excavator arm with the hand controls:

> When you travel for any distance, keep the stick inward and carry the boom in a low position.
>
> When you drive up a steep grade, keep the boom as close to the ground as possible.
>
> When you travel uphill or you travel downhill, keep the boom on the uphill side of the machine.

Operation and Maintenance Manual 95, Ex. 5, Def.'s Supp. Br., ECF No. 54-2. The Manual is clear: to travel in the excavator for "any distance" requires using the hand and foot controls at the same time. *Id.* There is no evidence that excavator operators never travel in the excavator, even for small distances. Yet, there is also no evidence that they do. It would be reasonable to conclude that part of operating the excavator involves moving it, even if only a few feet at a time, from place to place at the jobsite. Likewise, it would be hard to imagine how any reasonable juror could conclude that being able to operate the foot pedals of the excavator is a necessary function of being an excavator operator. If Henschel cannot properly, and in accordance with the use instructions of the manufacturer, move the excavator around a jobsite, he cannot perform the functions of his job and cannot serve as an excavator operator.

Bushong and Krchmar, the Managing Director for the Road commission and Defendant's Superintendent, respectively, are different from the other witnesses that Henschel has identified in one other material respect. They are responsible for exercising the Road Commission's duty of care to be sure that operators are safely assigned to equipment and, in default of performing that responsibility, subjecting the Road Commission to liability for damage he might create as well as personal injury to Henschel and third parties.

This point is not lost on the Equal Employment Opportunity Commission, which has concluded that employers can assess threats to the health and safety of an employee or others in deciding whether to return a disabled individual to work. *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84-87 (2002); *Hubbard v. Detroit Pub. Sch.*, 372 F. App'x 631, 637 (6th Cir. 2010). In *Chevron*, the Supreme Court upheld the EEOC's regulation permitting a "direct threat" defense to claims of discrimination under the ADA. Under the EEOC's regulations, "Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r). Under the "direct threat" jurisprudence, an employer need not make a reasonable accommodation if it would still result in a risk of harm to the employee seeking the accommodation. Essentially, the rule provides that it would be unreasonable to allow an employer to threaten the health and safety of himself and others. Here, Henschel's inability to move the excavator while carrying the boom in a stable position could create a situation that threatens his safety (e.g., if the excavator were to become unbalanced and topple) or the safety of anyone in the vicinity of the workplace. The testimony of experienced operators and the excavator manual attest to situations where this situation could actualize. Summary judgment for Defendant is warranted.

**B.**

The next question raised by Defendant's motion is slightly tangential to the primary inquiry of whether Henschel can operate the excavator but is nonetheless important and offers an alternative ground on which Defendant's motion may be granted. Even assuming that someone unable to operate the foot pedals of an excavator can operate that machine safely, what does it mean for *Henschel's case specifically* given that one of his treating physicians determined that he was completely disabled?

As Defendant rightly emphasizes, "where a plaintiff's 'own doctor,' not the defendant, has concluded she could not perform her job . . . [that plaintiff] cannot establish that she is a 'qualified individual with a disability' under the ADA." *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (quoting *Weigel v. Target Stores,* 122 F.3d 461, 467 (7th Cir. 1997)) (internal quotation marks omitted). But that rule is not hard and fast. Indeed, the caselaw concerning the applicability of declarations of disability for purposes of Social Security benefits to the realm of the ADA is more complex than that recited in *Dietelbach*.

The Supreme Court weighed in on the issue of Social Security disability claims to subsequent ADA suits in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). The *Cleveland* court held that "despite the appearance of conflict that arises from the language of the two statutes, the two claims do not inherently conflict to the point where courts should apply a special negative presumption" to ADA claims where the plaintiff previously alleged disability in an attempt to secure Social Security benefits. *Id.* at 802. The Supreme Court emphasized that "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 802-03. The primary reason for the two statutory claims' ability to coexist is the fact that the ADA "defines a 'qualified individual' to include a disabled person 'who . . . can

perform the essential functions' of her job '*with reasonable accommodation.*'" *Id*. at 803 (emphasis in original). Thus, a declaration of disability for the purposes of obtaining Social Security Disability Insurance ("SSDI") benefits is tantamount to simply declaring "I am entitled to SSDI benefits." *Kiely v. Heartland Rehab. Servs., Inc.*, 359 F.3d 386, 390 (6th Cir. 2004). Accordingly, declarations of disability in an "SSDI application can be interpreted as 'context-related legal conclusion[s]' rather than 'purely factual statement[s]' regarding inability to work" *Id*. at 390-391 (quoting *Cleveland*, 526 U.S. at 802).

In light of this framework, the Sixth Circuit's pre-*Cleveland* guidance is instructive. Testaments to disability made during an SSDI application or proceeding "should be analyzed under traditional summary judgment principles." *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 383 (6th Cir. 1998). *Griffith* adopted the Seventh Circuit's approach to SSDI disability evidence in *Weigel v. Target Stores*. Reciting that approach is helpful here:

> The point here is a simple one: When employees (and/or their physicians) represent that they are "totally disabled," "wholly unable to work," or some other variant to the same effect, employers and factfinders are entitled to take them at their word; and, such representations are relevant evidence of the extent of a plaintiff's disability, upon which an employer may rely in attempting to establish that an ADA plaintiff is not a "qualified individual with a disability." At the same time, because the SSA's definition of disability—as well as those of most disability insurance plans-differs materially from the ADA's definition of a "qualified individual with a disability," these representations are not conclusive as to the ADA issue. When a defendant in an ADA action relies on such representations as the basis for contending that a plaintiff is not a "qualified individual," the plaintiff is free to come forward with additional evidence that shows she could perform the essential duties of a desired position with or without reasonable accommodation notwithstanding the fact that she might have been deemed disabled under some other statutory or contractual framework. As a general matter—and as *Weiler* exemplifies—absent some such affirmative showing of the plaintiff's ability to perform the essential functions of the position, there will be no genuine issue of material fact as to whether the plaintiff is a "qualified individual" and the employer will be entitled to judgment as a matter of law.

122 F.3d 461, 467-68 (7th Cir. 1997) (footnotes omitted).

In Henschel's case, the testimony of his doctor that he is completely disabled is not dispositive. Henschel has demonstrated the ability to operate the excavator with at least sufficient competency that he has located some witnesses that believe he could do so safely. While it may be, as discussed above at § III.A, that Henschel cannot safely operate an excavator, the finding of disability by his treating physician, does not preclude a determination under the ADA that he cannot perform the essential functions of his job. The evidence is probative, however.

Based on Henschel's rehabilitation progress report dated December 28, 2010, Henschel was having difficulty performing everyday activities as a result of his injuries. His nurse case manager wrote the following concerning Henschel's functioning:

> . . . Mr. Henschel is not able to wear his prosthesis for long periods of time secondary to the bone spur discussed previously in this report, subsequently, he ambulates with bilateral axillary crutches. This interferes with his independence with activities of daily living. When using the crutches he is not able to carry items or perform any activities that require he ambulate or stand.

Rehab. Progress Rep. 5, Ex. 8, Def.'s Supp. Br., ECF No. 54-3. Yet, the progress report does note that Henschel is likely able to operate a personal tractor on his property as long as the machine had hand controls only. The case manager did also note that, with respect to operating his tractor, "Henschel is unable to use this tractor secondary to the location of the clutch, on the left lower pedal, as a result of the left prosthesis." *Id.* at 7.

Two years later, little had changed. Henschel's treating physician, Dr. Ravi Lakkaraju, examined him and determined that his impairments were still severe and impeded his ability to work. *See* Physiatry Consult, Ex. 7, Def.'s Supp. Br., ECF No. 54-3. After examining Henschel, Dr. Lakkaraju concluded:

> He has multiple impairments as a result of his motorcycle accident including closed head injury, traumatic optic neuropathy in the right eye with visual impairment and severe uncontrolled phantom pain causing significant mobility deficits. His impairments have caused permanent disability. He will not be able to return to any kind of employment and needs to go on long-term disability.

*Id*. at 3. Again, it is important to remember, this opinion was offered in the context of an SSDI evaluation. Nevertheless, Henschel must counter this evidence and demonstrate that there is a material issue of fact as to whether he is totally disabled.

Henschel provides as support for his position that he is able to work that he can operate the excavator using only his hands and that he was capable of performing all of the tasks in Mr. Krchmar's test. But those capabilities do not answer Dr. Lakkaraju's conclusion that over extended periods Henschel has difficulty with ambulating and that he has onsets of phantom pain that create "significant mobility deficits." Specifically, there is no explanation as to how Henschel would be able to function as an employee of the Clare County Road Commission without the ability to perform the tasks required of him at any given point during an eight-hour day. In fact, his level of pain from wearing the prosthesis for such long periods led to him having another surgery to shave down bone spurs after he was terminated. *See* Henschel Dep. 168-69, Ex. 3, Def.'s Supp. Br., ECF No. 54-1. In the two years following his termination he has spent the time exclusively healing from surgery. *Id*.

A reasonable juror could not conclude that Henschel's limitations on mobility and his experience with pain would allow him to complete a full day of work. Dr. Lakkaraju's analysis and the case management report prepared two years prior are unequivocal: Henschel has limitations on sustained functioning that are separate from his ability to operate an excavator using only his hands. Instead, they impose a significant disability on Henschel's daily life and, importantly for the current case, greatly limit his mobility. Summary judgment is also appropriate on this ground.

**IV.**

Accordingly, it is **ORDERED** that Defendant Clare County Road Commission's Motion for Summary Judgment, ECF No. 28, is **GRANTED**.

Dated: March 10, 2016                                  s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 10, 2016.

                              s/Michael A. Sian
                              MICHAEL A. SIAN, Case Manager

---